IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY HISTON, | No. C 09-0979 JSW (PR) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS; ON PENDING MOTIONS** |
| v. | |
| JAMES TILTON, et al, | |
| Defendants. | (Docket Nos. 26, 38, 39, 41, 46, 49, 50, 52, 55) |

### INTRODUCTION

This is a civil rights case filed by a pro se prisoner pursuant to 42 U.S.C. § 1983. He was given leave to amend the complaint, which he did on a timely basis. His amended complaint claims that he received inadequate medical care for carpal tunnel syndrome at San Quentin State Prison ("SQSP"). The Court found that the amended complaint failed to state a cognizable claim for relief against five defendants and those claims were dismissed. The Court found that the amended complaint stated cognizable claims against six other defendants, Dr. G.A. Wilson, Dr. Donald A. Calvo, Dr. Mohan Sundaresan, Dr. Jarom A. Daszko, and Physician Assistant Michael Scott, and ordered it served upon them at SQSP, where Plaintiff indicated that they were located.[1]

---

[1] In the amended complaint, Plaintiff identified Dr. Sundaresan as "Dr. Sunderesan" and Dr. Daszko was identified as "Jerom A. Dasko." In a motion addressed below (docket number 50), he has provided the correct spelling of their names, which is used in this order.

1   Defendant Dr. Clarene M. David has moved for summary judgment on the ground
2   that there are no material facts in dispute and that she is entitled to judgment as a matter
3   of law.[2]  Plaintiff has opposed the motion, and David has filed a reply.  For the reasons
4   set out below, David's motion for summary judgment is granted, and summary judgment
5   is also granted in favor of the unserved Defendants.  Additional motions filed by Plaintiff
6   are also addressed below.

## BACKGROUND

Defendant has supported her motion for summary judgment with Plaintiff's medical records and the records of his administrative appeals.[3]  Plaintiff's amended complaint is verified, so it serves as a declaration to the extent it states facts within Plaintiff's personal knowledge that are admissible into evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (complaint signed under penalty of perjury may serve as an affidavit in opposition to motion for summary judgment).  He also has provided his own separate declaration in opposition, as well as his medical records and records of his administrative appeals.  The following facts are undisputed except where otherwise indicated.

The parties' evidence shows that Plaintiff suffers from carpal tunnel syndrome in both of his hands and wrists.  On February 5, 2002, Plaintiff was experiencing pain and tingling in his wrists and fingers and was examined by Defendant Dr. G.A. Wilson.

---

[2] The remaining defendants have not been served.  The claims against them and Plaintiff's motion to again attempt service upon them are discussed at the end of this order.  References to "Defendant" in this order are to the movant, unless otherwise noted.

[3] Defendant has not submitted a declaration of a custodian of records authenticating these records.  *See* Civil Local Rule 7-5.  The Court makes note of this because while this is perhaps excusable for a pro se and incarcerated litigant such as Plaintiff, it is simply sloppy lawyering by Defendant's attorneys, J. Randall Andrada and Valery Ly.  This does not affect the Court's analysis in this order, however.  Because the parties do not dispute the authenticity of the records -- indeed, they both submit and rely upon the same records – the Court accepts them as authentic for purpose of this order.

1   (Amend Compl. Ex. A.)  Dr. Wilson prescribed and ACE bandage and pain medication.
2   (*Id.*)  Plaintiff was treated for similar symptoms in the prison's "drop-in clinic" on
3   November 14, 2002, where he was given an ACE bandage, pain medication and x-rays.
4   (*Id.* Ex. B.)  On November 21, 2002, Plaintiff wrote an administrative grievance to
5   Defendant Dr. Calvo, SQSP's Chief Medical Officer at that time, complaining of
6   swelling and pain in his wrists, and on December 5, 2002, Dr. Calvo responded by
7   setting up a doctor's appointment for plaintiff.  (*Id.*)  On April 18, 2003, Plaintiff was
8   seen by a neurologist, Dr. Mendius, who diagnosed with him carpal tunnel syndrome,
9   prescribed Vioxx for the pain, and ordered splints.  (*Id.* Ex. C.)  On May 2, 2003,
10  Plaintiff was seen by Dr. Menius again, who found "marginal" improvement and
11  recommended neurological testing (a "nerve conduction study) and surgery.  (*Id.*)  On
12  June 27, 2003, Dr. Calvo approved Plaintiff's transport to an outside facility for nerve
13  testing, and on August 6, 2003, Dr. Mendius conducted the tests.  (*Id.* Ex. D.)  Dr.
14  Mendius found that Plaintiff had "compressive neuropathy" on the bilateral median
15  nerves of his wrists, consistent with carpal tunnel syndrome, especially his right wrist,
16  and on the ulnar nerve at his elbows and wrists.  (*Id.*)

17       On September 4, 2004, plaintiff was seen by another doctor for continued pain,
18  tingling and numbing in his hands and wrists.  (*Id.* Ex. E.)  On March 30, 2005, Plaintiff
19  was examined by Defendant Dr. Sundaresan, a primary care doctor, because Plaintiff
20  complained that he did not receive the wrist splints.  (*Id.* Ex. F.)  Dr. Sundaresan ordered
21  wrist splints and elbow pads for Plaintiff, and found that Plaintiff suffered from
22  neuropathy in the ulnar and median nerves.  (*Id.*)  Plaintiff complained of wrist pains
23  again, and Dr. Sundaresan made the same findings when he examined Plaintiff again on
24  June 15, 2005, and also found that Plaintiff had a weaker grip in his left hand than his
25  right.  (*Id.*)  He requested and received muscle relaxers, which he had previously been
26  receiving, and on July 5, 2005, he also asked for more anti-inflammatory medication.
27
28                                               3

(*Id.*) On October 6, 2005, Defendant Dr. Wilson examined Plaintiff again for wrist pain, and he found that Plaintiff suffered from hypertension, obesity, and "bimanual tendonitis." (*Id.* Ex. A.) Dr. Wilson gave him medication for his hypertension, but not for his wrist pain. (*Id.*)

In 2006, Plaintiff was seen on multiple occasions for primary care by both Defendant Dr. Daszko and Defendant Michael Scott, a physician assistant, for complaints about carpal tunnel syndrome symptoms such as tingling, numbness and pain in his fingers and wrists. (*Id.* at 3.4, Ex. G.) Dr. Daszko explained that Plaintiff could improve his condition with exercise that would reduce the fluid in his wrists, and prescribed Tylenol. (*Id.*) Defendant Scott did not prescribe medication specific to Plaintiff's conditions, and neither Dr. Daszko or Schott pursued the surgical option, scheduled Plaintiff for follow-up appointments, or ordered Plaintiff new splints.

On January 30, 2007, Defendant Dr. David, a primary care doctor, saw Plaintiff when he experienced sharp and "excruciating" pain in his left wrist. (*Id.* Ex. H.) Dr. David ordered a Toradol injection for the pain, which Plaintiff received, and ordered him to miss work for two days. (*Id.*) On March 7, 2009, Plaintiff saw Dr. David again because his wrists were getting a rash from the splints, and the splints were not providing enough support because the metal supports had been removed for security purposes. (*Id.* at 3.5, Ex. I.) She determined that the plan of care was to "conservatively" manage the condition with splints at night, and she ordered a "stockinette" to insert between his wrist and the splint to stop the rash. (*Id.*) On April 6, 2007, Plaintiff saw Dr. David again because he started having "triggering" in two fingers on his left hand, and she referred him to an external orthopedic surgeon for consultation. (*Id.*) On May 3, 3007, Dr. Lyons found muscle atrophy and carpal tunnel syndrome, recommended a "release" surgery, and referred him to a hand surgeon named Dr. Matan.[4] (*Id.*) Four days later, on

---

[4]Neither Dr. Lyon nor Dr. Matan are defendants.

4

May 7, 2007, Dr. David conducted a follow-up appointment, reviewed Dr. Lyon's evaluation, and decided that she would wait until receiving Dr. Matan's evaluation before recommending surgery. (*Id.*) However, after examining Plaintiff again on June 19, 2007, Dr. David referred Plaintiff for surgery, and on July 27, 2007, at another follow-up appointment, indicated that she was waiting for a surgery appointment. (*Id.*)

On August 9, 2007, Dr. Matan examined Plaintiff and found significant muscular atrophy in the right hand, but not on the left, and he recommended a carpal tunnel release surgery on the left to release the left wrist and the "trigger" thumb and left ring finger. (*Id.* Ex. J.) Dr. Matan performed that surgery on October 17, 2007, with some "good" results, but also some continued numbness in certain fingers. (*Id.*; Ly Decl. Exs. G, H, K.) On November 29, 2007, Dr. Matan saw Plaintiff again, and scheduled surgery for the right hand, due to the muscular atrophy, and he performed a carpal tunnel release surgery on the right wrist on January 9, 2008. (Amend. Compl. Ex. J; Ly Decl. Exs. H, I.) On March 27, 2008, Plaintiff complained of continued pain, numbness and tingling from his left elbow to his fingers, and Dr. Matan recommended a nerve transfer surgery, which he performed on June 4, 2008. (Ly Decl. Ex. J.) Plaintiff also received nerve tests on May 16, 2008, by Dr. Leslie Gillum (who is not a defendant) at U.C.S.F., who found severe atrophy in a right hand muscle, as well as nerve damage ranging from severe to moderate in both hands. (*Id.* Ex. K.)

Plaintiff filed administrative appeals between November 2007 and August 2008 complaining of delays in treatment, in particular surgery, for his carpal tunnel syndrome. (*Id.* Ex. L.) In response to such appeals he received follow up appointments with primary care physicians and orthopedists, as well as surgery. (*Id.*) At the second level appeal, Dr. Tootell, the SQSP Chief Medical Officer, found that Plaintiff had received appropriate medical care for his condition. (*Id.*) With respect to performing surgery, Dr. Tootell indicated that "Upon completion of the consultation [by a specialist], the

5

recommendations are reviewed by the primary care physician and the plan of care is determined based on their assessment and the information provided by the consulting physician." (*Id.*)

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the nonmoving party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corporation Securities*

*Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Anderson*, 477 U.S. at 252). A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). A court may not disregard direct evidence on the ground that no reasonable jury would believe it. *Id.*

**B.     Analysis**

Plaintiff claims that Dr. David was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Defendant Dr. David argues that, even taking the evidence in a light most favorable to Plaintiff, she is entitled to qualified immunity and she was not deliberately indifferent to his serious medical needs.

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), held that there are two prongs to the analysis of qualified immunity. The court must first answer this question: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [official]'s conduct violated a constitutional right?" *Id.* at 201. If the court determines that the conduct did not violate a constitutional right, the official is entitled to qualified immunity. Under the second prong, the court asks "whether the right was clearly established" such that "it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." *Id.* at 200–02. If "the official's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id.* at 205.

7

The first question for the qualified immunity analysis is, therefore, whether Dr. David violated Plaintiff's Eighth Amendment rights. Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*).

Defendant concedes for purposes of her motion for summary judgment that a question of fact exists as to whether Plaintiff's medical needs were serious, so the Court will assume that they were serious for purposes of the summary judgment analysis. The question, then, is whether there is a genuine dispute of fact as to whether Dr. David was deliberately indifferent to those medical needs. A prison official is deliberately indifferent if the standard for "criminal recklessness" is met, i.e., she knows that and disregards an excessive risk to inmate health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The term "deliberate indifference" requires a showing that the official was subjectively aware of the risk. *Id.* at 828-829. Mere negligence, or medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06.

Plaintiff claims that Dr. David was deliberately indifferent to his carpal tunnel syndrome because she did not order surgery sooner and she did not order more supportive wrist splints. The undisputed evidence shows that Dr. David waited five months (from January to June 2007) to refer Plaintiff for surgery from the time she first

saw him for carpal tunnel syndrome symptoms.[5] During those five months she provided him with a substantial amount of care, including an injection of pain medication at the first appointment, leave him from his work assignment, four follow-up examinations, a stockinette to make his splints more comfortable, and a referral to an orthopedic surgeon (Dr. Lyman) for consultation who in turn referred him to an additional orthopedic surgeon (Dr. Matan). Even liberally viewed in Plaintiff's favor, these actions far from establish that Dr. David was criminally reckless, or deliberately indifferent, to Plaintiff's medical condition. *See Farmer*, 511 U.S. at 837; *see, e.g., Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain medication, treating broken nose and providing replacement crutch, because claims amounted to no more than negligence).

Plaintiff argues that notwithstanding the other treatment Dr. David provided, her failure to schedule the surgery sooner was deliberately indifferent because she knew that this presented a substantial risk of causing further nerve damage. He points to the recommendation in 2003 by Dr. Mendius that Plaintiff receive surgery for his condition as evidence that she knew he needed surgery right away. Presumably Dr. David was aware of this recommendation because it was in his medical records, but the fact that she did not follow this recommendation does not establish that she was deliberately indifferent. Doctors can disagree over the proper course of treatment for a condition, of course, and a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1059-60 (9th Cir.

---

[5]Plaintiff's first surgery was in October 2007, but there is no evidence suggesting that Dr. David, who was Plaintiff's primary care physician, had any control over how quickly the surgery would happen once she referred him for surgery. Even if she could have anticipated some or all of this delay, for the reasons discussed below, there is not sufficient evidence that her conduct amounted to deliberate indifference.

9

2004).  Dr. David described her approach to Plaintiff's condition as "conservative," an approach that was approved by another doctor, Dr. Tootell.  The fact that her approach differed from the approach recommended by Dr. Mendius is insufficient on its own to establish her deliberate indifference.

In order to prevail on a claim where there are choices between alternative courses of treatment, a plaintiff must show that the course of treatment the defendant chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health.  *Toguchi*, 391 F.3d at 1058.  Here, the surrounding circumstances do not establish that the conservative course Dr. David chose was medically unacceptable.  Plaintiff points to the fact that the two orthopedic surgeons he saw in 2007, Dr. Lyman and Dr. Matan, recommended surgery as well based on the same information Dr. David had available to her, namely the August 2003 neurological test results.  The opinions of Dr. Lyman and Dr. Matan only shows that surgery was a medically acceptable course, but it does not show, and there is nothing in their opinion indicating, that Dr. David's alternate approach was not medically acceptable as well.  It is also worth noting that by the time Dr. Matan had recommended surgery in August 2007, Dr. David had already referred him for surgery in June.

Plaintiff also states that Dr. Matan, Dr. Lyman and Dr. Gillum, who examined Plaintiff after his surgery, told him that his results would have been better if surgery had been done sooner and that the delays in surgery for carpal tunnel syndrome can cause further nerve and muscle damage.  These statements are inadmissible hearsay because Plaintiff has presented no declarations from these doctors, nor do these findings appear in the medical records, and thus cannot properly be considered at this stage.  Nevertheless, even if they could be considered, at most they would establish Dr. David's negligence, not deliberate indifference, because even if Dr. David, who is not a surgeon or a neurologist, chose a course of treatment that was medically unacceptable and

1  resulted in further harm to Plaintiff, there is no evidence that she actually and
2  subjectively *knew* that the course she prescribing presented a substantial risk of such
3  further harm.

4        A similar analysis applies to Plaintiff's complaint that Dr. David did not order
5  splints with more support.  Dr. Sundaresan had ordered splints for Plaintiff's wrists in
6  2005, but prison officials removed the metal supports in the splints, presumably under
7  the belief that the pieces of metal presented a security risk to the prison.  Plaintiff
8  complains that without the supports, the splints were not effective, and that Dr. David
9  should have ordered new splints with support.  Even if it is assumed that more supportive
10 splints could have been ordered without prison officials removing them again, as they
11 had done, the evidence, at most, can only establish Dr. David's negligence in failing to
12 order them.  There is no evidence that Dr. David knew that prison officials would allow
13 splints with more support, or that she knew that without such the supports, the splints
14 posed a substantial risk that of further damage to Plaintiff's hands and wrists.

15       The undisputed evidence establishes that Dr. David provided Plaintiff with a
16 substantial amount of care and attention for his condition, including referring him for
17 surgery.  Even viewing the evidence of her decisions and the surrounding circumstances
18 in a light most favorable to Plaintiff, it does not establish that her actions, including
19 failing to schedule surgery sooner or order new splints for him, were, much less that she
20 knew them to be, medically unacceptable.  Consequently, Defendant David is entitled to
21 summary judgment on Plaintiff's claims.

22 **II.**    **<u>Unserved Defendants</u>**

23       The Marshal attempted to serve all the defendants at SQSP, where Plaintiff
24 indicated that they were located.  The summonses on all of the defendants except for Dr.
25 David were returned unserved because either the unserved defendants were no longer
26 located at SQSP or Plaintiff had not provided their correct names.  Plaintiff has moved

11

for an order for the Marshal to serve Defendants Dr. Sundaresan, Dr. Daszko, Dr. Calvo, and Dr. Jones again, providing their names and addresses where they supposedly can be served (Docket No. 50).[6] Because the unserved defendants stand in the same position as Dr. David with respect to Plaintiff's claims – they treated Plaintiff's carpal tunnel syndrome prior to Dr. David and they did not order surgery – serving them and requiring them to file a dispositive motion would be an empty gesture.

Summary judgment may be granted by the Court sua sponte in favor of a nonappearing party on the basis of facts presented by other defendants who have appeared. *See Columbia Steel Fabricators v. Ahlstrom Recovery*, 44 F.3d 800, 802-03 (9th Cir.) (affirming grant of summary judgment in favor of nonappearing defendant where plaintiff, in response to summary judgment motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant; *see also Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) (holding district court properly granted motion for judgment on the pleadings as to unserved defendants where such defendants were in a position similar to served defendants against whom claim for relief could not be stated); *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) (holding district court on its own motion may grant motion to dismiss as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants).

The facts presented by the moving Defendant, Dr. David, show that a reasonable jury could not return a verdict against the unserved Defendants. Plaintiff's claims that the unserved Defendants did not provide surgery or other particular types of treatments sooner, like the claims of this nature against Dr. David, amount to a disagreement over the proper course of treatment to take. As explained above, this does not establish that

---

[6]Plaintiff calls this motion a motion to amend and for an extension of time

Defendants were deliberately indifferent to Plaintiff's medical needs. The evidence presented establishes that the unserved Defendants' course of treatment was not medically unacceptable, much less that any of them knew that to be the case. Even if it is assumed that Plaintiff's condition worsened and that the worsening is fairly attributable to the unserved Defendants' course of treatment, this would establish at most their negligence – not their deliberate indifference – because there is no evidence that any of the unserved Defendants knew that their course of treatment presented a substantial risk of serious injury to Plaintiff. Plaintiff's medical records establish that Plaintiff received a very significant amount of medical attention and treatment for his condition from all of the Defendants, including the unserved Defendants, as well as from other medical personnel between 2002 and 2008, including pain medication, bandages, splints, elbow pads, numerous appointments with primary care physicians and specialists, neurological testing at an outside facility, and x-rays, before ultimately receiving three surgeries. Because the record establishes that the Defendants, including the unserved ones, were not deliberately indifferent to Plaintiff's serious medical needs, summary judgment will be granted in their favor.

### III. Additional Pending Motions

Plaintiff has filed a motion to compel discovery of various documents. Plaintiff has not in good faith attempted to meet and confer with Defendants prior to filing his motion, as required by Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure. Plaintiff's motion to compel (docket number 39) is DENIED.[7]

Plaintiff's motions for extensions of time in which to file reply briefs on his motion to compel and motion to serve the unserved defendants (docket numbers 49, 52 and 55) are GRANTED.

---

[7] The Court notes that Plaintiff received his complete medical records, which run 1500-2000 pages. The relevance of the other documents he seeks is unclear, but the Court does not rule on the merits of his motion to compel.

13

Plaintiff's motion for summary judgment and extension of time to file said motion (docket numbers 38, 41 and 46) are DENIED for the same reasons discussed above that Defendants are entitled to summary judgment, and in light of his subsequent motion to withdraw said motion.

## **CONCLUSION**

For the foregoing reasons, Defendant David's motion for summary judgment (Docket No. 26) is GRANTED.  Summary judgment is also GRANTED in favor of the remaining Defendants.

Plaintiff's motion to compel (docket number 39) is DENIED.  Plaintiff's motions for extensions of time (docket numbers 49, 52, 55) are GRANTED.  Plaintiff's motion for summary judgment and extension of time (docket numbers 38, 41 and 46) are DENIED.  Plaintiff's motion to amend his complaint and for and extension of time to serve Defendants again (docket number 50) is DENIED as moot.

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: February 14, 2012

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

LARRY HISTON,

        Plaintiff,

  v.

JAMES TILTON et al,

        Defendant.

Case Number: CV09-00979 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 14, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Larry Histon
J79124
San Quentin State Prison
San Quentin, CA 94974

Dated: February 14, 2012

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk